Filed 12/5/24  P. v. Trujillo CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B326889 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA263278 |
| TIMOTHY JAMES TRUJILLO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Norman J. Shapiro, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Nicholas J. Webster and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2006, a jury convicted Timothy James Trujillo of the second degree murder of Mario Alvarado. Trujillo now appeals from an order denying his petition for resentencing under Penal Code section 1172.6.[1] The trial court concluded Trujillo had not made a prima facie showing of eligibility for resentencing relief. Trujillo contends the trial court—the same court that had presided over his 2006 trial—erred by making "factual findings requiring the weighing of conflicting evidence and credibility determinations." He also argues ambiguities in the jury instructions and the prosecutor's statements during closing argument allowed the jury to convict him without finding he personally harbored malice. We find the record of conviction conclusively establishes Trujillo's ineligibility for resentencing as a matter of law. We therefore affirm the trial court's denial of his petition.

## FACTS AND PROCEDURAL BACKGROUND

1. ***Mario Alvarado is killed in the Los Angeles County Jail***

We take our statement of the facts from the testimony at Trujillo's trial. Trujillo summarizes that testimony in his briefs. In addition, we previously granted the Attorney General's request for judicial notice of the reporter's transcripts in Trujillo's direct appeal from his conviction, *People v. Trujillo* (Mar. 27, 2008, B192062) [nonpub. opn.] (*Trujillo I*).[2]

---

[1] References to statutes are to the Penal Code. Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.)

[2] We refer to the factual background from Trujillo's trial only "for background purposes and to provide context for the parties'

2

In December 2003, Jorge Lopez was in the Los Angeles county jail.  There were two other inmates in the cell with Lopez: Mario Alvarado and Jorge Munoz.  After two or three days, Trujillo was put in the cell with the other three men.  Lopez, Alvarado, and Munoz were considered "paisas."  A paisa is a person from "the countryside"—usually a "[f]oreign national"—who is not a gang member.  Trujillo was a Sureno, or "Southsider."

The first night Trujillo was in the cell with the three other men, he stayed up all night drinking pruno.  Pruno is an inmate-made alcoholic beverage.  The next morning, Trujillo was still drinking.  Trujillo asked Alvarado to drink pruno with him and to sing.  Alvarado drank "a couple of shots" of pruno and sang one song.  Lopez told Alvarado not to drink with Trujillo.

Trujillo wanted Alvarado to keep singing.  Trujillo "got mad" and started pushing Alvarado.  Alvarado jumped into his bunk and Trujillo tried to pull him out.  Trujillo eventually pulled Alvarado off his bed.  Trujillo threw a lot of punches at Alvarado; Alvarado covered himself with his arms.  Trujillo hit Alvarado in the face.  Trujillo said, "These paisas don't want to fight." Deputies took Trujillo out of the cell.

Howard Goldberg was an inmate in the county jail in December 2003.  In the early evening of December 9, inmates were being moved from the Inmate Reception Center (IRC) to another facility known as Wayside.  Goldberg was in a group of inmates waiting inside a laundry room area.  Goldberg saw Trujillo and another man enter the laundry room, "strike"

arguments." (*People v. Flores* (2022) 76 Cal.App.5th 974, 978, fn. 2.)

another inmate in the face, and then leave.  As inmates waited in the hallway in line, Goldberg saw Trujillo and the same second man "attack" an inmate behind Goldberg.  Goldberg was unsure if that inmate was the same man he'd seen Trujillo hit in the face earlier:  "[i]t might['ve] been the same person."  The victim of the "attack" "fought back."  He socked Trujillo in the eye "and swelled his eye up."

One of the deputies saw the altercation, took the victim out of the line, and had him sit on a bench in the middle of the hallway.  Goldberg was staring at Trujillo and Trujillo said, " 'What you are looking at?' "  Trujillo "flexe[d] his chest and yell[ed,] 'Sureno[s]' . . . a couple of times."

As the line of inmates moved, Trujillo went into cell 215 and Goldberg went into cell 217, next door.  Goldberg heard "thumping sounds" as if a scuffle were going on in cell 215, and sounds of a fist hitting something or the wall.  Deputies then told the group of inmates in cell 217 to "pile into" cell 215.  At some point, Goldberg went to use the toilet in cell 215 and saw a "man with his head bashed in lying face-down with bloody clothes on top of his head."  Blood was "spattered all over the wall."

Goldberg reached down to see if the man had a pulse but a group of inmates told him to mind his own business.  Goldberg saw the prone man's face "[v]ery clearly."  It was "the worst thing [he'd] ever seen in [his] life."  Goldberg "knew he was dead."  Goldberg didn't say anything to the deputies because he was scared.  There's a code of conduct in jail against "rats."

Goldberg then got on the bus to Wayside.  Trujillo was on the same bus.

On December 9, 2003, Brandon English also was an inmate in the county jail. He was in cell 215. Trujillo was in that cell as well. Alvarado was brought into the cell. Trujillo walked toward Alvarado and told him to "come here." Alvarado shook his head "no." Trujillo approached Alvarado, put his arm around him, and walked him over to where another man was who had been talking with Trujillo.

Trujillo then "punch[ed] [Alvarado] in the face." Alvarado "went down to the ground" and "immediately, like, curled up." Four or five other people came in and they "started jumping [Alvarado], punching him, kicking him." Alvarado was dragged toward the back of the cell. Trujillo and "one other dude" who was with him "just commenced to jumping and stomping on [Alvarado], kicking him, beating him."

Alvarado was making a loud "gargling breathing" noise. Trujillo grabbed Alvarado and "drug him . . . inside the little wall part of the stall." Trujillo was stomping and kicking Alvarado. Trujillo "had . . . one, like hard, jump, stomp against the back of [Alvarado's] . . . head." Trujillo said "he had to die, that he must die."

Another inmate, Timothy Keiffer, testified at trial that he was in cell 218, across from cell 215. Keiffer saw "several inmates beating up on one individual." He was "[b]eing hit with fists." The man being beaten "went down to the ground." Keiffer saw "about six" men "just start stomping on [the victim] and kicking him."

Keiffer testified Trujillo was punching the victim and also was one of those stomping him after he was on the ground. Keiffer said Trujillo and another man dragged the victim into

a corner by the toilet and sink stall. Trujillo stomped on the victim "multiple times."

A detective later showed Keiffer 60 to 80 photos and Keiffer chose six, including a photo of Trujillo. In Keiffer's view, Trujillo was the "main aggressor"—he "was more in control of the situation than the others." According to Keiffer, Trujillo "[p]articipated not only in [the] beating but continually stomped on [the] individual over by the toilet, even after it was over."

On cross-examination Keiffer admitted he'd named two inmates other than Trujillo—Javier Arteaga and Javier Bocanegra—as the two who dragged Alvarado over to the toilet.[3]

Shawn Hansborough testified he'd been an inmate in cell 215 that evening. He saw Trujillo there. Trujillo called a man Hansborough referred to as "a paisa" a "rat." Trujillo "[s]tarted socking" the man, then he "and the rest of his, um, buddies" "circled" the man and "just . . . beat him down." This was "[r]ight by the toilet."

---

[3]  At trial, the defense called a sheriff's department sergeant who testified jail paperwork showed Keiffer was at the Twin Towers and then the Men's Central Jail—not the IRC—from December 3 until the morning of December 10. In his brief here, Trujillo asserts the sergeant testified "it was impossible for Kieffer [*sic*] to be at IRC without it being listed in the computerized records." Trujillo is mistaken. Here was the exchange:

"Q [by defense counsel]: Now it's possible that he [Keiffer] could have been housed in the IRC module without it being reflected in here [referring to the inmate housing movement records defense counsel had subpoenaed], is it not?

"A: It's possible."

The man "fell, and he was helpless, and they just kept beating him and beating him," with their hands and feet, "stomping him, kicking him" until "he was unconscious." Hansborough "specifically" saw Trujillo kicking the man. Trujillo and "the rest of the guys that was around beating [the man]" pulled him closer into the toilet stall. After Trujillo and the others lay the man by the toilet, Trujillo stood over him and spit on him.

Alvarado's body was discovered in cell 215 around 11:00 p.m. on December 9. The body was lying face down covered with trash and inmate clothing.

A coroner testified the cause of Alvarado's death was blunt trauma to the head and neck, and asphyxia caused by the neck injuries.

## 2. *The charges, trials, verdicts, and sentence*

The People charged Trujillo with Alvarado's murder. The People alleged Trujillo had a prior strike for burglary.

Trujillo was tried twice. His first jury was unable to reach a verdict. (*Trujillo I*.) At Trujillo's second trial in May 2006, the court instructed the jury with (among other instructions) CALJIC Nos. 3.00 (Principals–Defined), 3.01 (Aiding and Abetting–Defined), 8.10 (Murder–Defined), 8.11 ("Malice Aforethought"–Defined), 8.20 (Deliberate and Premeditated Murder), 8.30 (Unpremeditated Murder of the Second Degree), 8.31 (Second Degree Murder–Killing Resulting from Unlawful Act Dangerous to Life), 8.50 (Murder and Manslaughter Distinguished), 8.70 (Duty of Jury as to Degree of Murder), 8.71 (Doubt Whether First or Second Degree Murder), 8.72 (Doubt Whether Murder or Manslaughter), 8.74 (Unanimous Agreement

7

as to Offense–First or Second Degree Murder or Manslaughter), and 8.75 (Jury May Return Partial Verdict–Homicide).

In light of the testimony that Trujillo had been drinking pruno, the court gave the jury CALJIC Nos. 4.21 (Voluntary Intoxication–When Relevant to Specific Intent), 4.21.2 (Voluntary Intoxication–Aider and Abettor), 4.22 (Voluntary Intoxication–Defined), and 8.47 (Involuntary Manslaughter–Killing While Unconscious Due to Voluntary Intoxication).

The court did not give the jury CALJIC No. 3.02 (Principals –Liability for Natural and Probable Consequences).

The jury in Trujillo's second trial acquitted him of first degree murder and found him guilty of second degree murder. Trujillo waived jury on his priors and the trial court found true the allegations that Trujillo had a prior strike as well as four prison priors. The court sentenced Trujillo to 35 years to life in the state prison, calculated as 15 years to life for the murder, doubled because of the strike, plus five years under section 667, subdivision (a)(1). The court imposed three one-year terms for three of the prison priors, to be served concurrently; it imposed and stayed the fourth prison prior. Another panel of this court affirmed Trujillo's conviction. (*Trujillo I*.)

### 3.   *Trujillo's petition for resentencing*

In May 2022 Trujillo, representing himself, filed a form petition for resentencing under section 1172.6. Trujillo checked boxes on the form stating (1) he was convicted "[a]t trial" "of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine," (2) he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019,"

8

and (3) he "was convicted of 2nd degree murder under the natural and probable consequences doctrine or under the 2nd degree felony murder doctrine and [he] could not now be convicted of murder because of changes to Penal Code § 188, effective January 1, 2019." Trujillo did not check box 1 or box 5 (which applies only to first degree murder), but he checked the subboxes to box 5 that stated, "I was not the actual killer," "I did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree [*sic*]," and "I was not a major participant in the felony **or** I did not act with reckless indifference to human life during the course of the crime or felony." Trujillo also checked a box that stated, "I request that this court appoint counsel for me during this re-sentencing process."

The court appointed counsel for Trujillo. The prosecution filed an opposition to Trujillo's petition. The prosecution contended Trujillo "was convicted under the legal theory of directly aiding and abetting a 2nd Degree murder." The prosecution noted the trial court had not instructed the jury on either the natural and probable consequences doctrine or felony murder. The prosecution asserted, "The record of conviction proves beyond a reasonable doubt that the defendant personally acted with malice aforethought." The prosecution attached as an exhibit the court of appeal opinion in Trujillo's direct appeal.

Trujillo's counsel filed a reply. Counsel noted Senate Bill No. 775 prohibited the court from "consider[ing]" the appellate court's opinion "for anything except determining a case's procedural posture." Counsel contended "it does not preclude

9

eligibility for consideration now that the jury back then was 'instructed [about Trujillo] as an aider and abettor.' . . . [J]ust as with felony murder and *Banks/Clark* analysis[4], yesterday's standards and tests and factors do not dispose of today's petitions or automatically preclude issues' consideration." Counsel did not explain how the law had changed since 2006 as to direct aiders and abettors.

Counsel also argued Trujillo was entitled to an evidentiary hearing because "it has not and cannot be determined that Trujillo was the actual killer." Citing *People v. Garcia* (2022) 82 Cal.App.5th 956 (*Garcia*), counsel also argued "the evidence at trial did not establish that Trujillo's actions actually caused death."[5]

Counsel appeared before the trial court on November 22, 2022. Trujillo was present on Webex. The court had noted at an earlier status conference that it was "in receipt of" Trujillo's petition, the court of appeal opinion on direct appeal, "a copy of

---

4    In *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, our Supreme Court "provided substantial guidance on the meaning of" the phrases " 'major participant' " and " 'reckless indifference to human life.' " (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*).) Those terms apply in felony-murder cases. In Trujillo's case, the prosecution did not proceed on a felony-murder theory, nor did the court instruct the jury on felony murder.

5    *Garcia* was a felony-murder case. Garcia was the actual killer of the 82-year-old victim. The issue in *Garcia* was whether he could be considered the " 'actual killer' " when the victim died from lethal cardiac arrhythmia an hour after Garcia had assaulted and robbed him. (*Garcia, supra,* 82 Cal.App.5th at pp. 959–960.)

the original information," the jury instructions, the verdict forms, the abstract of judgment, and "a register of actions document from the clerk." The court stated it "recall[ed] the matter . . . because . . . the court as well as the staff and the jury and the parties went to the county jail to view the scene." The court continued, "This matter involved a beating at the L.A. county jail where the victim of course died by blunt force trauma in somewhat of a group beating where the defendant certainly took part."

Trujillo's counsel told the court, "I am submitting on the pleadings and asking the court to hold that my client has met his prima facie burden at this stage of the proceedings to show that he is eligible for consideration for resentencing under 1172.6, that the court should issue an O.S.C. to the People as to why he is not entitled to relief."

The prosecutor, referring to his "opposition papers," responded, "[I]n order to make a prima facie showing the petitioner has to show that he was convicted under a theory of either natural and probable consequences or felony murder, and the appellate court opinion shows those instructions were not given to the jury. . . . On the contrary, the defendant was convicted as an aider and abettor in first [*sic*] degree murder as a malice murder I should say . . . . As a threshold matter he's not met the prima facie showing."

The court asked Trujillo's counsel if he wished to respond. Counsel replied, "I will submit on my written pleadings, Your Honor."

The court stated,

> "I have considered the written pleadings
> from both sides. [¶] The court at this time,

Mr. Meister, is going to deny any relief to Mr. Trujillo. I'll further add, and I know I listened to the case, I heard the case, I received the verdict. This court received a verdict. Your client was either the actual killer in this matter in the beating or at the very least a major participant directly with reckless indifference to human life, so I don't believe he is entitled to any relief."

## DISCUSSION

### 1. *Section 1172.6*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*)) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *Strong, supra,* 13 Cal.5th at pp. 707–708; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*)). (Stats. 2018, ch. 1015, §§ 2–3.) Section 188, subdivision (a)(3) now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule. (*Gentile,* at pp. 842–843.)

Section 1172.6 authorizes an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts if he could no longer be convicted of murder because of the legislative

12

changes to the definitions of the crime. (See *Strong*, *supra*, 13 Cal.5th at p. 708; *Lewis*, *supra*, 11 Cal.5th at p. 957; *Gentile*, *supra*, 10 Cal.5th at p. 843.) Effective January 2022, the Legislature extended resentencing eligibility to individuals convicted of murder on "any theory under which malice is imputed to a person based solely on that person's participation in a crime." (Stats. 2021, ch. 551.)

If a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner if requested. (*Lewis*, *supra*, 11 Cal.5th at pp. 962–963; see § 1172.6, subd. (b)(1)(A), (b)(3).) The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing that he is entitled to relief. (§ 1172.6, subd. (c).)

In deciding whether a petitioner has made a prima facie showing for relief under section 1172.6, the court takes the petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his factual allegations were proved. If so, the court must issue an order to show cause. (*Lewis*, *supra*, 11 Cal.5th at p. 971; see *People v. Curiel* (2023) 15 Cal.5th 433, 463–464 (*Curiel*).) The court may consider the record of conviction, which will "necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis*, at p. 971; see *Curiel*, at pp. 463–464; *People v. Williams* (2022) 86 Cal.App.5th 1244, 1251 (*Williams*).) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving

the weighing of evidence or the exercise of discretion.' " (*Lewis*, at p. 972; see *People v. Eynon* (2021) 68 Cal.App.5th 967, 975.) But if the record of conviction contains facts refuting the allegations made in the petition, the trial court is justified in rejecting them. (*Eynon*, at p. 975; see *Lewis*, at p. 971.)

The jury instructions are part of the record of conviction, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion,' " which may not take place until after an order to show cause issues. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, review granted on other grounds Sept. 23, 2020, S263939 and held for *Lewis*, review dismissed Nov. 17, 2021, opinion citable to the extent not inconsistent with *Lewis*; see *People v. Estrada* (2022) 77 Cal.App.5th 941, 943, 946 (*Estrada*) [jury instructions showed trial court never instructed jury on natural and probable consequences doctrine; summary denial of petition affirmed].)

## 2. *Trujillo is ineligible for resentencing as a matter of law*

Trujillo notes the trial court, in denying his petition, stated he " 'was either the actual killer in this matter in the beating or at the very leas[t] a major participant directly with reckless indifference to human life [*sic*].' " As the terms "major participant" and "reckless difference" concern defendants tried under a felony-murder theory, and this was not a felony-murder case, Trujillo asserts the court erred. Trujillo also contends the court—having tried the case—erred by "rel[ying] on its own factual determinations" in recalling the trial.

14

Trujillo is correct that the court erred by referring to him as a major participant who acted with reckless indifference to human life. As for the trial court's recollection of the trial, the court did not say it relied *only* on its recollection. The court stated it had received Trujillo's petition, the jury instructions, the verdict forms, the abstract of judgment, and a "register of actions document."

In any event, independently reviewing the matter as we must (*People v. Burns* (2023) 95 Cal.App.5th 862, 866), "we keep in mind that we review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm.'" (*People v. Camacho* (2022) 14 Cal.5th 77, 123–124. See also *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1148, fn. 4 ["Because we must affirm if the court's ruling was correct on any basis, we consider alternative bases for the order."].)

    a.    *The jury convicted Trujillo as the actual killer or a direct aider and abettor*

The record of conviction demonstrates the jury convicted Trujillo as—at a minimum—a direct aider and abettor of Alvarado's murder. The court did not instruct the jury on felony murder or the natural and probable consequences doctrine. Direct aiding and abetting requires the jury to find the defendant acted with express malice—intent to kill—and is therefore still a valid theory of liability of aiding and abetting. (*Gentile*, *supra*, 10 Cal.5th at p. 848 [well settled that Senate Bill No. 1437 "does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought"]; *Williams, supra,* 86 Cal.App.5th at p. 1252 [same]; *People v. Lopez* (2024) 99 Cal.App.5th 1242, 1248 ["An accomplice who directly aids and abets the perpetrator

15

in committing murder is liable for murder [following Senate Bill No. 1437] just as he or she was liable" before its enactment.].)

As our Supreme Court has explained, "to establish liability for murder under the theory of direct aiding and abetting, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' " (*Curiel, supra,* 15 Cal.5th at p. 466.) The jury had to find all of these elements to be true to convict Trujillo of murder under an aider and abettor theory. Here, the jury was instructed Trujillo could be found guilty of murder on such a theory if it concluded he had knowledge of the perpetrator's unlawful purpose and "[b]y act or advice," "[w]ith the intent or purpose of committing or encouraging or facilitating the commission of the crime," he "aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (CALJIC No. 3.01.)

Trujillo does not dispute this governing law. Instead, he contends the record of conviction "does not conclusively negate the possibility that the jury found [him] guilty of second degree murder by imputing to him the implied malice of Alvarado's the [*sic*] actual killer." Trujillo relies heavily on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*). That reliance is misplaced.

In *Langi*, the jury rejected a felony-murder theory, but found the defendant guilty of second degree murder, robbery, and battery. (*Langi*, *supra*, 73 Cal.App.5th at p. 977.) The *Langi* court reasoned that, because the instruction for second degree implied malice murder did not require a finding that the perpetrator intended to kill, the aiding and abetting jury instructions left open the possibility that the jury convicted

16

the appellant for intending to aid the perpetrators' intentional acts, without necessarily possessing an intent to aid or encourage the victim's killing. (*Id.* at p. 983.)

Here, the only theories on which Trujillo's jury was instructed were first and second degree murder (as well as voluntary and involuntary manslaughter as lessers), either as a direct perpetrator or as an aider and abettor. These theories remain valid and do not qualify for section 1172.6 relief. (See *Reyes, supra,* 14 Cal.5th at p. 990.) The ambiguity the *Langi* court found there is not present here. CALJIC No. 3.01 required the aider and abettor to know the perpetrator intended to commit "the crime." The only crime charged here was murder, either first or second degree. In other words, murder was the target offense. By contrast, in *Langi*, the defendant also was charged with and found guilty of the crimes of robbery and battery. (*Langi*, *supra*, 73 Cal.App.5th at pp. 976–977.) Thus, the ambiguity in the jury instructions in *Langi* allowed for the possibility that the defendant had been convicted of aiding and abetting murder based on a finding that he intended to aid and abet a non-murder battery or other crime. But here, the only crime charged—murder—required one of two different intents: either intent to kill (express malice) or conscious disregard for human life (implied malice). We see no reasonable possibility the jury could have found that Trujillo, as an aider and abettor, could know the perpetrator intended to commit a specific crime and help the perpetrator commit that crime—here defined in CALJIC Nos. 8.11 and 8.31 as requiring intent to kill or a conscious disregard for human life—and yet not personally harbor the requisite mens rea. As our Supreme Court has said, where the only unlawful purpose charged is an unlawful killing,

"one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1123.)

        b.    *The prosecutor's closing argument did not mislead the jury or permit it to convict Trujillo on an imputed malice theory*

We also reject Trujillo's contention that the prosecutor's closing arguments exacerbated any potential ambiguity. Trujillo complains that the prosecutor, in discussing " 'principals' " in a crime, "did not specify whether 'the crime' was the assault or murder." He also complains that the prosecutor, in discussing aiding and abetting, used the analogy of a getaway driver in a bank robbery, and referred to the "equally guilty" language in CALJIC No. 3.00. In addition, he argues the prosecutor, in telling the jury that "assaulting someone who is laying [*sic*] on the floor" constitutes implied malice, "urged the jury to convict appellant of second degree murder if it was not able to find express or implied malice."

The prosecutor didn't "specify" whether "the crime" as used in CALJIC Nos. 3.00 and 3.01 was assault or murder because the People didn't charge Trujillo with assault. Nor did the prosecutor ever utter the words "natural and probable consequences," nor did he argue that the jury could convict Trujillo of murder if it found he intended only to aid and abet an assault. The trial court instructed the jurors on the definition of "principals" and on direct aiding and abetting. It did not instruct them with CALJIC No. 3.02 on the natural and probable consequences doctrine. (See *Estrada, supra,* 77 Cal.App.5th at pp. 946–949 [in light of jury instructions, prosecutor's statements in closing argument which defendant "characterize[d] as a 'natural and

18

probable consequences theory' " of murder did not entitle defendant to evidentiary hearing].)

As for Trujillo's second argument, the prosecutor never argued Trujillo could be guilty of murder if some other inmate kicked and beat Alvarado to death and Trujillo didn't know that would happen, intending to assist only in an assault. Instead, the prosecutor told the jury it could convict Trujillo of murder as either a direct perpetrator or an aider and abettor. The prosecutor said the judge would instruct the jurors on aiding and abetting and, again, the judge did that. The prosecutor cited the trial testimony of Brandon English that, as Trujillo stomped on Alvarado, he said something like, " 'He's got to die.' "

As for the "equally guilty" language, our Supreme Court has explained CALJIC No. 3.00 "generally state[s] a correct rule of law. All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) Nevertheless, the high court has cautioned the instruction's use of the phrase "equally guilty" could be "misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding." (*Ibid*.)[6] There was no such risk of the jury being misled here. And, regarding the "getaway driver" analogy, the law remains that a direct aider and abettor need not be present at the scene if the other requirements for direct aiding and abetting are met. (See CALCRIM No. 401 ["If all of these

---

[6] The former version of CALCRIM No. 400 also contained the "equally guilty" language. (See *Estrada*, *supra*, 77 Cal.App.5th at pp. 947–948.) The current version of CALCRIM No. 400 does not contain that language. (CALCRIM No. 400.)

requirements [elements 1–4] are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."].)

Trujillo's third argument about implied malice lacks merit as well. The trial court instructed the jury with CALJIC No. 8.11. That instruction told the jurors that malice may be express or implied, and that malice is implied when the killing resulted from an intentional act; the natural consequences of the act are dangerous to human life; and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

In closing, the prosecutor argued Trujillo's statement that Alvarado "had to die" was "an expression of an intent to kill" and therefore constituted express malice. The prosecutor went on to discuss implied malice, telling the jury, "[I]f you stomp someone's neck while they are laying [*sic*] defenseless on the ground, you don't have to say anything. You implied your intent to kill. You have told us everything we need to know." Referring to English's testimony, the prosecutor stated Trujillo made that statement "just before what can only be termed the coup de grâs, the final blow, where he jumps on [the] back of [Alvarado's] head." The prosecutor continued, "How many times can you kick somebody in the face, in the neck, and say you didn't want to kill him?" Nothing in these statements invited the jury to convict Trujillo on a theory of imputed malice.

c.     *Section 1172.6 does not provide an opportunity for Trujillo to relitigate claims of errors at his trial*

Finally, Trujillo continues to assert he could not have killed Alvarado because, by the estimated time of Alvarado's death, Trujillo had already been transported to Wayside. He refers to

20

other "disputed evidence at [his] trial" and says "the evidence of [his] guilt was, at least, a close call." But a defendant may not use the procedures set forth in section 1172.6 to relitigate his conviction or the underlying trial. "The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding. . . . The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947; see also *People v. Coley* (2022) 77 Cal.App.5th 539, 549 [a section 1172.6 petition "is not a means by which a defendant can relitigate issues already decided"]; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438 [section 1172.6 "does not permit a petitioner to establish eligibility on the basis of alleged trial error"].)

In sum, the jury instructions given here required the jury to find Trujillo personally harbored express or implied malice either as the actual killer or a direct aider and abettor. He accordingly is ineligible for relief under section 1172.6 as a matter of law.

## DISPOSITION

We affirm the trial court's order denying Timothy James Trujillo's petition for resentencing.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


EGERTON, Acting P. J.

We concur:


ADAMS, J.


BERSHON, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.